FILED
United States Court of Appeals
Tenth Circuit

February 27, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

CHRISTOPHER COLMAN CHAMBERS,

     Defendant - Appellant.

No. 17-5046

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(No. 16-CR-118-JHP-2)**
_____

Stephen J. Greubel, Senior Litigator (Julia L. O'Connell, Federal Public Defender, Office of the Federal Public Defender, with him on the briefs), Tulsa, Oklahoma, for Defendant - Appellant.

Leena Alam, Assistant United States Attorney (Loretta F. Radford, Acting United States Attorney, and Janet S. Reincke, Assistant United States Attorney, with her on the brief), Office of the United States Attorney for the Northern District of Oklahoma, Tulsa, Oklahoma, for Plaintiff - Appellee.
_____

Before **MATHESON**, **BALDOCK**, and **EID,** Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Christopher Chambers was indicted on one count of being a felon in possession of firearms and ammunition under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Law enforcement officers from Rogers County, Oklahoma discovered the firearms after searching his home pursuant to a search warrant. They had been investigating Kevin Chambers (Christopher's brother) and Charity Drozd (collectively, "the Pair"), who were suspected of selling methamphetamine and were residing at Christopher Chambers's home.[1]

After he was indicted, Mr. Chambers moved to suppress the firearms evidence. He argued the affidavit submitted in support of the search warrant application failed to establish probable cause and that the good-faith exception to the exclusionary rule did not apply. The district court rejected these arguments and denied the motion. Mr. Chambers pled guilty, reserving the right to appeal the denial of his suppression motion, which he has done here.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The affidavit established a minimally sufficient nexus between the place to be searched and the suspected criminal activity to make the officers' reliance on the warrant reasonable.

## I. BACKGROUND

### A. *The Investigation and Search*

#### 1. Officers' Investigation of the Pair

On August 1, 2016, Rogers County officers monitored communication between the Pair and a confidential police informant (the "CI"). The Pair told the CI they were

---

[1] We refer to Defendant - Appellant Christopher Chambers as Mr. Chambers.

returning to Rogers County from Tulsa with methamphetamine. Ms. Drozd said they could not deliver drugs to him that night because they needed to make other customer deliveries. Officers arranged with the CI to make a controlled buy from the Pair on the next day.

The next morning, the Pair texted and called the CI, stating they had awakened and would meet him soon. The three met and the CI bought one gram of methamphetamine from the Pair for $100. Law enforcement officers also monitored their communication before and during the transaction. At the meeting, the Pair bragged to the CI about how much methamphetamine they had. After the transaction, officers met the CI to debrief him and to secure the drugs, which tested positive as methamphetamine.

The CI gave directions to where the Pair lived. The officers in turn confirmed that the location belonged to Kevin Chambers's brother, Mr. Chambers, based on their previous encounters with him.

2. **The Search of Mr. Chambers's Home**

On August 6, 2016, Rogers County Deputy Sheriff Quaint Tucker prepared an affidavit to search 11470 S. 4210 Road ("the Address"), Mr. Chambers's residence. A Rogers County District Judge signed the search warrant, which authorized officers to seize methamphetamine and other items related to drug dealing. On August 8, 2016, officers searched Mr. Chambers's home. They encountered the Pair and Mr. Chambers and detained them outside. In the home, they discovered seven firearms loaded with ammunition. They also recovered marijuana, methamphetamine, and drug paraphernalia.

3

Mr. Chambers was indicted for being a felon in possession of firearms and ammunition under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He had nine prior felonies.

## B. *The Affidavit*

Deputy Tucker's nine-page affidavit listed the Address on the first page and contained aerial photos of the property on the first two pages, including a label stating "Residence to be searched" and an arrow pointing to the location. The affidavit addressed four subjects: (1) a description of the property and items to be seized, (2) Deputy Tucker's training and experience, (3) drug traffickers' common practices, and (4) facts to establish probable cause.[2] The fourth part was based mostly on information from two sources: Deputy Tucker and the CI.

First, based on "his training and experience both formal and informal," ROA, Vol. I at 85, and information from the investigation, Deputy Tucker said the Pair likely:

- are "career criminal [sic] involved in the possession of narcotics." *Id.*

- "will keep and store items, like those sought in this affidavit, at their residence." *Id.*

---

[2] The affidavit is reproduced in the Appendix. Each part is briefly described below:
  (1) Description of the property and items to be seized - The address, description, photos, directions, and items to be seized—such as methamphetamine and drug paraphernalia.
  (2) Deputy Tucker's training and experience - Length of employment, hours of training, and number of narcotics investigations.
  (3) Drug traffickers' common practices - Officer Tucker stated that "[d]rug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents." ROA, Vol. I at 82.
  (4) Facts to establish probable cause - Information about the investigation, reliability of the CI, and the Pair's residence.

- "will store evidence, such as that sought in this affidavit, throughout their property." *Id.*

- "will have in their residence and surrounding property items used to ingest methamphetamine" and items for methamphetamine distribution. *Id.* at 85-86.

Second, the affidavit included facts about the CI's interactions with the Pair on August 1 and 2, 2016. It also included:

- Kevin Chambers's statement to the CI about encountering the police in July 2016 at a bank drive-thru when he was carrying methamphetamine.

- The following paragraph on the eighth page titled "Residence Identified":

> [The CI] was able to give directions to the residence he knew Kevin and Charity to live. Investigators were able to confirm the address to belong to Kevin's brother Christopher Chambers from previous encounters with law enforcement. The address is known as.

*Id.* at 85. The paragraph ended without stating the address of the residence.[3]

Finally, the affidavit included a statement from officers verifying the reliability of the CI, describing his help in previous cases that led to the seizure of eight pounds of methamphetamine and other illicit items.[4]

---

[3] We refer to this paragraph as the "Residence Identified paragraph."

[4] The affidavit stated that officers had verified information that the CI provided about the Pair. For example, officers had corroborated from the police log the CI's statement that "Kevin had bragged to him about being awoken by a deputy in the month of July 2016 asleep in a bank drive through." ROA, Vol. I at 84.

5

## C. *The Motion to Suppress*

Mr. Chambers moved to suppress the firearms and ammunition evidence. He argued the affidavit did not establish probable cause and the good-faith exception did not apply because the affidavit failed to tie evidence of the Pair's criminal activity to the Address. The magistrate judge concluded in a Report and Recommendation ("R&R") that the motion should be granted. The Government objected, stating there was enough factual support linking the evidence of criminal activity to the Address.

The district court rejected the magistrate judge's R&R and denied Mr. Chambers's motion. It concluded the affidavit sufficiently connected information about the criminal activity to the location to be searched both (1) to provide probable cause and (2) to justify the application of the good-faith exception. *United States v. Chambers*, No. 16-CR-118-JHP, 2016 WL 7429441, at *5 (N.D. Okla. Dec. 23, 2016)

Mr. Chambers next entered into a plea agreement. He pled guilty to the sole count of the indictment, but reserved the right to appeal the district court's denial of his motion to suppress.

## II. **DISCUSSION**

Mr. Chambers challenges the district court's rulings regarding probable cause and the good-faith exception. We review only the latter. "We have previously taken this approach of assuming a deficiency [of probable cause] without deciding the issue and applying *Leon* [good-faith analysis.]" *United States v. Potts*, 586 F.3d 823, 832 (10th Cir. 2009); *see also United States v. Quezada-Enriquez*, 567 F.3d 1228, 1230 (10th Cir. 2009).

6

As explained below, we affirm the district court's ruling on the good-faith exception because officers conducting the search could have relied in objective good faith on the search warrant.

## A. *Standard of Review*

"Determinations relating to the . . . the applicability of the good-faith exception are conclusions of law . . . which this court reviews de novo." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000). "In reviewing the denial of a motion to suppress, this court views the evidence in the light most favorable to the government and upholds the district court's factual findings unless clearly erroneous." *Id.*[5]

## B. *Legal Background*

### 1. The Exclusionary Rule and the *Leon* Good-Faith Exception

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. To authorize a valid search under the Fourth Amendment, "[a] search warrant must be supported by probable cause, requiring more than mere suspicion but less evidence than is necessary to convict." *Danhauer*, 229 F.3d at 1005 (quotations omitted).

"Ordinarily, courts will remedy a Fourth Amendment violation by invoking the exclusionary rule to exclude the Government's introduction of the unlawfully seized evidence as direct evidence against the defendant in a criminal prosecution." *United States v. Herrera,* 444 F.3d 1238, 1248 (10th Cir. 2006). But if a search warrant is later

---

[5] Both parties agree that there are no facts in dispute. *See* Aplt. Br. at 5 ("The underlying facts are not in issue."); Aplee. Br. at 1 (same).

7

found to lack probable cause, evidence seized "does not necessarily have to be suppressed." *United States v. Riccardi,* 405 F.3d 852, 863 (10th Cir. 2005). In *United States v. Leon,* 468 U.S. 897 (1984), the Supreme Court recognized the "good-faith exception" to the exclusionary rule.

"Under the good-faith exception to the exclusionary rule, if a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief . . . ." *United States v. Edwards*, 813 F.3d 953, 970 (10th Cir. 2015) (quotations omitted); *see also Leon*, 468 U.S. at 922. Reliance upon a warrant issued by a neutral magistrate creates a "presumption . . . [that] the officer is acting in good faith." *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985) (citing *Leon*, 468 U.S. at 925-26).

2. **No Good-Faith Exception when the Affidavit Lacks Indicia of Probable Cause**

The good-faith presumption is not absolute. *See Danhauer*, 229 F.3d at 1007 (noting exceptions to the presumption). An "officer's reliance on the defective warrant still must be objectively reasonable." *United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017). An officer's reliance is objectively unreasonable when the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (quotations omitted).[6]

---

[6] The *Leon* Court also specified three other situations when an officer's reliance would be objectively unreasonable: (1) the affiant knowingly or recklessly misled the issuing magistrate regarding information material to the probable cause determination; (2) the magistrate judge "wholly abandoned his judicial role;" and (3) the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the

8

An affidavit lacks indicia of probable cause when it does not contain factual support. "When we consider whether the officer relied in good faith upon a warrant, we must look to the underlying documents to see whether they are *devoid* of factual support, not merely whether the facts they contain are legally sufficient." *Cardall*, 773 F.2d at 1133; *see United States v. Augustine*, 742 F.3d 1258, 1263 (10th Cir. 2014). An affidavit devoid of factual support is "one that merely states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Roach*, 582 F.3d 1192, 1204-05 (10th Cir. 2009).

The affidavit does not have to be a model of specificity. *See United States v. Henderson*, 595 F.3d 1198, 1202 (10th Cir. 2010). "An affidavit has enough factual support to justify reliance if it establishes a *minimally sufficient nexus* between the illegal activity and the place to be searched." *Id.* (emphasis added) (quotations omitted).

## C. *Analysis*

We review only the district court's application of the *Leon* good-faith exception. The court concluded the exception applied because the affidavit established a minimally sufficient nexus between evidence of the illegal activity and the place to be searched. On appeal, Mr. Chambers argues the affidavit's omission of the Address in the Residence Identified paragraph rendered the affidavit devoid of factual support and precluded good-faith reliance on the warrant.

things to be seized—that the executing officers [could not] reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

9

To justify a search of the Address, the affidavit needed to present evidence connecting the Pair's criminal activity and the Address, which in this case involved three steps. The affidavit was supposed to show probable cause that (1) the Pair's home would likely contain evidence of their criminal activity, (2) the Pair lived at Mr. Chambers's home, and (3) Mr. Chambers's home was located at the Address. Mr. Chambers contests the second and third steps. Although the affidavit listed 11470 S. 4210 Road on its first page, he argues the Address's omission from the Residence Identified paragraph severed any connection between the Pair and his home or between his home and the Address. Without such a connection, he contends the affidavit lacked a minimally sufficient nexus between evidence of the Pair's criminal activity and the place to be searched.

We disagree with this argument. Deputy Tucker's affidavit was not devoid of factual support. Contrary to Mr. Chambers's assertions, the affidavit linked the Pair to Mr. Chambers's home and linked his home to the Address. It was objectively reasonable for the officers who searched Mr. Chambers's home to rely on the warrant.

1. **Deputy Tucker's Affidavit Was Not Devoid of Factual Support**

Deputy Tucker's affidavit established a minimally sufficient nexus between the criminal activity and the place to be searched. Despite its failure to specify the Address in the Residence Identified paragraph, the affidavit adequately connected the Pair's criminal activity to the Address because it established that (1) in Deputy Tucker's experience, methamphetamine dealers—like the Pair—keep items at their residences related to distributing the drug; (2) the Pair resided in Mr. Chambers's home; and (3) Mr. Chambers's home was located at 11470 S. 4210 Road. *See* ROA, Vol. I at 78-86.

10

Mr. Chambers argues the omission of the Address in the Residence Identified paragraph "rendered the warrant so lacking in any indicia of probable cause that the officers' belief in its existence was entirely unreasonable." Aplt. Br. at 10. He contends that the "affidavit . . . lacked any factual basis whatsoever to support the belief that [the Pair] resided at [Mr. Chambers's home]." Aplt. Br. at 32. He further argues "[the Address] is not identified as that of Christopher Chambers." Aplt. Br. 11-12.

Deputy Tucker's affidavit, however, provided a sufficient factual basis for concluding that the Pair resided with Mr. Chambers and that Mr. Chambers's home was located at the Address, even though it did not explicitly say so in the Residence Identified paragraph. An affidavit is not generally devoid of factual support if it provides "underlying factual circumstances regarding veracity, reliability, and basis of knowledge" to support its assertions. *Roach*, 582 F.3d at 1204-05. Here, the affidavit did so. The CI, who had been a reliable source for officers in previous cases, "was able to give directions to the residence he knew Kevin and Charity to live." ROA, Vol. I at 85. Officers then verified that this "address . . . belong[ed] to Kevin's brother Christopher Chambers from previous encounters with law enforcement." *Id.*

The warrant was not based on an affidavit that "merely states suspicions, beliefs, or conclusions." *Roach*, 582 F.3d at 1204-05. It adequately linked the Pair's criminal activity to the place to be searched.

11

2. **Deputy Tucker's Affidavit Had More Factual Support than the Affidavit in *Gonzales***

Mr. Chambers argues that this "appeal should be directly controlled by *United States v. Gonzales*," a case in which we declined to apply the good-faith exception. Aplt. Br. at 32 (citing *United States v. Gonzales*, 399 F.3d 1225 (10th Cir. 2005)). We disagree because the affidavit in this case contains more factual support than the one in *Gonzales*.

a. *United States v. Gonzales*

In *Gonzales*, after law enforcement officers found live ammunition in the defendant's car, they decided to obtain a search warrant for defendant's home. *Id.* at 1228. The affidavit (1) stated the defendant was a convicted felon; (2) reported the discovery of ammunition in the defendant's car; (3) stated that based on the affiant's experience and training, the defendant would likely keep firearms at his residence; and (4) identified the place to be searched as 321 E. Church. *Id.* at 1227-28, 1230. We held that the good-faith exception did not apply because the affidavit failed to connect the place to be searched with the defendant. *Id.* at 1231.

The panel said the affidavit lacked a "minimal nexus between the place to be searched and the suspected criminal activity." *Id.* The affidavit "listed the address of the place to be searched . . . . [but] there were no facts explaining how the address was linked to [the defendant] . . . or the suspected criminal activity." *Id.* at 1230. Rather, the "only attempt at a connection was the detective's assertion that in his experience" firearms are often kept at residences. *Id.*

12

b.  *Deputy Tucker's affidavit compared to the one in* Gonzales

Unlike the affidavit in *Gonzales*, Deputy Tucker's affidavit contained "facts explaining how the address was linked to [the defendant] . . . or the suspected criminal activity." *Id.*

In *Gonzales*, the affidavit included the officer's opinion that individuals often keep firearms at their residences, and it listed an address.  Without more "facts explaining how the address was linked to [the defendant]," we rejected an inference that the listed address was the defendant's residence.  *Id.*  Although Deputy Tucker's affidavit also included his opinion that drug dealers often keep drugs and drug paraphernalia at their residences, this statement was not the affidavit's "only attempt at . . . connect[ing]" the Pair to the home or the home to Mr. Chambers.  *Id.*  Rather, Deputy Tucker's affidavit stated that the CI provided directions to the Pair's residence and that the authorities verified the address as Mr. Chambers's from their previous encounters.

Deputy Tucker's affidavit more closely resembles the affidavit in *United States v. Roach*, 582 F.3d 1192 (10th Cir. 2009), in which we determined that the search warrant affidavit contained indicia of probable cause justifying the application of the good-faith exception.  *Id.* at 1204-05.  The affidavit (1) identified 1441 N. Minneapolis Street as the place to be searched and (2) stated that officers verified the defendant lived at the address "through investigations, which included checking for utilities information, driver's license records, real estate records, Wichita Police Department records, tax records, social security records, U.S. Postal Service records, interviews and/or surveillance." *Id.* at 1198.  Although we determined the affidavit lacked probable cause because it did not

specify *which* one of these methods law enforcement used to verify Mr. Roach lived at the address, *id.* at 1203,[7] "the language of the affidavit indicates that officers did so using at least one of a list of investigatory methods, any one of which would—assuming they were successful—provide a 'minimal nexus' connecting [the defendant] to the address," *id.* at 1204.

Like the affidavit in *Roach*, Deputy Tucker's affidavit described the investigatory methods used—a reliable CI's information and independent corroboration through officers' previous encounters with Mr. Chambers—in determining the Pair's residential address. "[I]t would not be entirely unreasonable, therefore, for officers executing the warrant to rely on the magistrate's authorization of it." *Id.* at 1204.

\* \* \* \*

Deputy Tucker's affidavit possessed a minimally sufficient nexus between the place to be searched and the Pair's criminal activity. Because the affidavit contained a factual basis connecting the Pair to Mr. Chambers's home and the home to the Address, the district court properly applied the good-faith exception in this case.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Mr. Chambers's motion to suppress the evidence.

---

[7] In addition to specifying the investigatory method, the affidavit faced other problems that precluded our finding of probable cause, such as stale information. *Roach*, 582 F.3d at 1202.

14

# United States v. Chambers

# 17-5046

# APPENDIX

## AFFIDAVIT FOR SEARCH WARRANT                    - ORIGINAL

| | | |
|---|---|---|
| STATE OF OKLAHOMA | ) | IN THE DISTRICT COURT |
| | ) ss. | |
| COUNTY OF ROGERS | ) | |

No._____

## AFFIDAVIT FOR SEARCH WARRANT

The undersigned affiant, being duly sworn, upon oath says: that in Rogers County, Oklahoma, at or upon or within a certain vehicle and/or house, building or premises, the curtilage thereof and the appurtenances thereunto belonging, in Rogers County, Oklahoma, known as follows:

### 11470 S. 4210 Rd in the Foyil area of Rogers County

Appearing in the following:





78

**Description of property to be searched:** The property to be searched has two residences on it that all occupants on the property frequent. The main residence on the property is a single family residence. The door to this residence faces to the east towards S. 4210 Rd. The second residence is a metal structured shop with living quarters. The door to this residence faces south and is located directly south east of the main residence. The residences are both located on the same property at the dead end of S. 4210 Rd.

**Directions to property to be searched:** From the intersection of E. 390 Rd and S. 4210 Rd in the Foyil area of Rogers County travel south on S. 4210 Rd. The road will dead end into the driveway identified as 11470 S. 4210 Rd on the Google mapping system.



79

There are certain items of property, and evidence of violations of the laws of the State of Oklahoma, to-wit:

> Methamphetamine

> Items commonly used to ingest methamphetamine such as syringes

> Items commonly used to consume methamphetamine by inhalation like, pipes, bongs, and aluminum foil

> Items commonly used to distribute methamphetamine such as clear plastic baggies and measuring devices such as scale

> Electronic devices such as cell phones used to record any and all drug transactions

> Ledgers and electronic devices used to record and store any and all drug transactions

> Mail and other personal letters, or documents to prove residency

> US. Currency used in purchasing narcotics from individual reference RCSO Case# R1600353

## Affiant's Training and Experience

1: Your affiant states that he is a Deputy for the Rogers County Sheriff Department and has been so employed for more than five years, presently assigned as a narcotics officer in the Investigation division.

2: Your affiant was trained in narcotics investigations and the recognition of controlled substances by the state of Oklahoma CLEET Basic Academy.

3: Your affiant has attended over six hundred and forty-eight hours of additional training including one hundred twenty hours in the criminal investigation academy provided by CLEET.

4: Your affiant has also received informal training from veteran officers assisting on multiple narcotics cases involving controlled buys leading to search warrants.

5: Your affiant has attended over twenty four hours training specifically in search warrant writing.

80

6: Your affiant has participated in the writing of over thirty five search warrants and assisted in the service of over fifty.

7: Your affiant has seized and aided in the seizure of over two hundred meth labs.

8: Your affiant has interviewed over five thousand individuals who use, distribute, and and/or manufacture controlled substances, including methamphetamine and the manufacturing of methamphetamine.

9: Your affiant has aided in the seizure of over one hundred items used to consume/ingest methamphetamine.

10: Your affiant has been involved in multiple controlled deliveries of pseudoephedrine for individuals manufacturing methamphetamine.

11: Your affiant has made over thirty felony arrests on individuals purchasing pseudoephedrine for the sole purpose of manufacturing methamphetamine.

12: Your affiant consistently reads and reviews new tactics and laws pertaining to the manufacturing of methamphetamine and the distribution of narcotics.

## COMMON PRACTICES OF UNLAWFUL DRUG
## USERS/DISTRIBUTORS/TRAFFICKERS OF CONTROLLED DANGEROUS SUBSTANCES

Your Affiant has participated in numerous illicit drug distribution Investigations and based upon my training and experience, and consultation with other officers, your Affiant, knows that:

81

1.      Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results due to the fact that drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

2.      Persons involved in drug distribution/trafficking frequently conceal caches of drugs, large amounts of currency generated from/intended for the distribution thereof, financial instruments and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money.

3.      Drug distributors/traffickers commonly maintain addresses or telephone numbers in

notebooks, papers, cellular communication devices, computers and electronic storage media which reflect names, addresses, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if said items may limited or otherwise be in code. Contacts maintained within a cellular communication device will oftentimes specify names and/or nicknames/monikers, concerning co-conspirators with they are involved in their illicit activity. Moreover, said contact information will include some acquaintances associated with the user of the device which contributes to establishing the identity or otherwise evidence of dominion and control for the user of the device.

4.      Your Affiant has consulted with other agents who have participated in numerous searches of

cellular telephones found to be in the possession of drug users/dealers/traffickers where text messages and other communications were discovered discussing topics such as quantities, prices and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions being discussed. Frequently, these communications are in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications. In all phases of drug distribution, the utilization of cellular communication devices is essential. As drug

8.          Through my experience in cases in which a forensic search/download of a cell phone was conducted, that the examining officer(s) was/were able to recover data that had previously been deleted by the device's user. Although this initial effort to delete the data *(i.e., text messages, photos, etc.)* is oftentimes thought by the user to have been permanently removed from the device, in many cases, downloading/imaging software utilized for the purpose of examining cell phones was still able to recover the data from the device. That the effort at deletion of information from the device is commonly undertaken to prevent evidence from being recovered by law enforcement.

9.          On an increasing basis, smartphones are equipped with and various providers offer services that collect location information for the phone when it is lost or stolen *(i.e., find my phone)*. Additionally, various smartphones are equipped with technology that collects information in the form of metadata that maintains the time and geographic location of the device at the time images are captured with the device. This technology, when operational, oftentimes results in the telephone collecting/maintaining historical information for the physical movement of the device. Stored data for the location of the phone during various time periods, particularly those periods in which probable cause exists that the phone/user was engaged in criminal activity such as those offenses specified herein frequently provides relevant evidence, including information relevant to identifying the user of the device during a particular time period, as well as locations of criminal associates and evidence of the crimes in which they are engaged.

### Facts Establishing Probable Cause

Investigators monitored communication between (Kevin G. Chambers DOB: 10/10/1973 Charity Faith Drozd DOB: 04/19/1982) and confidential informant TTF-11 on 08/01/2016 in reference to the purchase of methamphetamine. Investigators obtained information from Charity that her along with Kevin were on their way back from Tulsa and had just re-upped. Charity stated that she along with Kevin had several stops to make to individuals who had already purchased product. Charity stated it would be late until they could deliver any to the informant. Investigators made the decision to wait until the following day to attempt a purchase.

Investigators were able to conduct a controlled buy from Kevin and Charity on 08/02/2016. Investigators made the controlled buy in the Foyil area of Rogers County. Investigators arranged to by one gram worth of methamphetamine in exchange for one hundred dollars. Investigators

had an informant known as TTF-11 conduct the controlled buy. Investigators monitored the arrangements made by both text messages along with phone calls made using cell phones. Kevin and Charity stated they had just woke up and would head straight to the informant from their residence.

Investigators monitored Kevin and Charity make arrangements to bring methamphetamine to the informant's location. Investigators monitored the transaction using an open line of communication. Kevin and Charity arrived at the informant's location and began conducting the transaction. Kevin and Charity began to brag about how much product they had and were moving. Kevin also stated he had a large amount in his possession the night before and had ran from the police in the Verdigris area of Rogers County. Kevin and Charity left shortly after this transaction. Investigators met the informant at a separate location. Investigators then retrieved the product from the informant at the separate location at which time it field tested positive for methamphetamine.

### Statements made by Kevin to TTF-11

TTF-11 stated that Kevin had bragged to him about being awoken by a deputy in the month of July 2016 asleep in a bank drive through. TTF-11 stated that Kevin boasted about having seven eight balls of methamphetamine on his person at the time of contact. Kevin stated the deputy woke him up and advised him to move on. Kevin thought this was funny that the deputy had no idea. Investigators were able to confirm that this encounter did occur between a Rogers County deputy and Kevin from an activity log kept by Rogers County dispatch.

### Reliability of TTF-11

TTF-11 has proven his reliability in the past by providing information on narcotic distributors leading to multiple felony arrests.

TTF-11 has aided in the seizure of:
- Over eight pounds of methamphetamine
- Two stolen vehicle's
- Small amounts of marijuana, methamphetamine, cocaine, and heroin

84

TTF-11 has proven all knowledge shared with law enforcement to be true and correct based on firsthand knowledge.

## Residence identified

TTF-11 was able to give directions to the residence he knew Kevin and Charity to live. Investigators were able to confirm the address to belong to Kevin's brother Christopher Chambers from previous encounters with law enforcement. The address is known as .

## Additional Probable Cause Evidence will be at the Suspect's Residence

Your affiant states that through his training and experience both formal and informal that individuals involved in narcotics violations over an extended period of time tend to be habitual offenders. Your affiant states the information provided by TTF-11 along with the criminal history of Kevin Chambers and Charity Drozd indicates them to be a career criminal involved in the possession of narcotics.

I have learned that offenders such as Kevin Chambers and Charity Drozd will keep and store items, like those sought in this affidavit, at their residence. Furthermore, it is the opinion of your affiant, and other investigators with the Rogers County Sheriff's Office, that the items sought in this warrant will be located at the place to be searched. In fact, it is very unlikely that habitual offenders such as Kevin Chambers and Charity Drozd will discontinue their illegal activities without law enforcement intervention.

In addition, I have learned that offenders such as Kevin Chambers and Charity Drozd will store evidence, such as that sought in this affidavit, throughout their property. Based on the observations of vehicles and other items concealed from view, it is my opinion that the items sought in this affidavit will be throughout the property, which is why I am seeking authorization to conduct the search on the entire parcel described herein.

In my training and experience, methamphetamine offenders such as Kevin Chambers and Charity Drozd will have in their residence and surrounding property items used to ingest methamphetamine such as syringes and items used to smoke methamphetamine. Furthermore, Your affiant states that it is common, that people who manufacture and/or distribute narcotics, keep measuring devices such as scales, packaging equipment, and plastic baggies. Your affiant also states that it is common practice for

individuals that are distributing or manufacturing to keep records in ledgers, and or cellphones, or other electronic storage devices. Your affiant states that individuals that manufacture, or distribute methamphetamine commonly use syringes and glass smoking devices to consume or ingest

Your affiant states that this affidavit is being submitted for the limited purpose of determining whether probable cause exists to justify the issuance of a search warrant for the premises described. Each and every fact known to your affiant or others concerning this investigation has not been included in this affidavit. Your affiant has only set forth facts believed to be essential in determining probable cause for issuance of a search warrant for the described premises.

## FURTHER YOUR AFFIANT SAYETH NOT.

WHEREFORE, Affiant asks that a search warrant issue according to law, directed to any Sheriff, Policeman or Law Enforcement Officer in Rogers County, Oklahoma, commanding that he search said persons, premises and/or vehicle, and take possession of all the controlled dangerous substances, equipment and paraphernalia hereinbefore described, and any vehicle in which said dangerous substance is unlawfully kept, deposited or concealed.

DEPUTY Quint Tucker, Affiant

SUBSCRIBED AND SWORN to before me this 6ᵗʰ day of August 2016. Time: 1:30 o'clock P.m.

JUDGE OF THE DISTRICT COURT

.86

## AFFIDAVIT FOR SEARCH WARRANT

---

STATE OF OKLAHOMA       )                  **IN THE DISTRICT COURT**

                                  )     ss.

COUNTY OF ROGERS          )

                                  No. _____

## <u>AFFIDAVIT FOR SEARCH WARRANT</u>

The undersigned affiant, being duly sworn, upon oath says:  that in Rogers County, Oklahoma, at or upon or within a certain vehicle and/or house, building or premises, the curtilage thereof and the appurtenances thereunto belonging, in Rogers County, Oklahoma, known as follows:

## 11470 S. 4210 Rd in the Foyil area of Rogers County

**Appearing in the following:**



**EXHIBIT A-1**

87

**Description of property to be searched:** The property to be searched has two residences on it that all occupants on the property frequent. The main residence on the property is a single family residence. The door to this residence faces to the east towards S. 4210 Rd. The second residence is a metal structured shop with living quarters. The door to this residence faces south and is located directly south east of the main residence. The residences are both located on the same property at the dead end of S. 4210 Rd.

**Directions to property to be searched:** From the intersection of E. 390 Rd and S. 4210 Rd in the Foyil area of Rogers County travel south on S. 4210 Rd. The road will dead end into the driveway identified as 11470 S. 4210 Rd on the Google mapping system.





**EXHIBIT A-2**

88